IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEAN LOUI VARGAS-MALAVE, #57172-177, MOVANT, | § § § § | |
| v. | § § | CIVIL CASE NO. 3:20-CV-3612-S-BK (CRIMINAL CASE NO. 3:18-CR-235-S-2) |
| UNITED STATES OF AMERICA, RESPONDENT. | § § § | |

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b) and *Special Order 3*, this civil action was referred to the United States Magistrate Judge for case management, including the issuance of findings and a recommended disposition where appropriate. Movant Jean Loui Vargas-Malave ("Vargas") filed a *pro se* motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Upon review, the § 2255 motion should be **DENIED**.

**I. BACKGROUND**

In 2019, Vargas pled guilty to a superseding information charging him with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine. On February 3, 2020, he was sentenced to 120 months' imprisonment, representing a downward variance of 31 months from the advisory guideline range. Crim. Doc. 385. Although Vargas did not file a direct appeal, he timely filed this § 2255 motion. Doc. 2. In his amended motion and brief, he alleges that his trial counsel rendered ineffective assistance by failing to file a notice of appeal despite Vargas' request that he do so. Doc. 7 at 4-8; Doc. 4 at 18-20. Also, Vargas asserts ineffective

assistance of counsel during the guilty plea and sentencing proceedings, as well as breach of the plea agreement and double jeopardy. Doc. 4 at 5-18, 21-32; Doc. 8 at 2-13 (*Suppl. Mem.*).

The Government filed a response in opposition and Vargas filed a reply. Doc. 11; Doc. 14. On October 20, 2021, an evidentiary hearing was held on Vargas's claim that counsel failed to file a requested notice of appeal, and Vargas later filed a post-hearing brief on that issue. Doc. 31.[1]

Upon review of the evidence, relevant pleadings and applicable law, the Court finds that trial counsel was not constitutionally ineffective for failing to file a notice of appeal and that Vargas' remaining claims also fail. Consequently, his § 2255 motion lacks merit.

## II. COUNSEL'S FAILURE TO FILE A NOTICE OF APPEAL

### A. Applicable Standard

The Sixth Amendment guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). To obtain post-conviction relief on a claim that defense counsel was constitutionally ineffective, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness" and that any such deficiency was "prejudicial to the defense." *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). Failure to establish either deficient performance or prejudice defeats the claim. *Id.* at 697.

In *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), the United States Supreme Court applied the *Strickland* test to claims "that counsel was constitutionally ineffective for failing to file a notice of appeal." The Supreme Court reaffirmed the well-settled rule that "a lawyer who

---

[1] Although the Government also was granted an opportunity to file a responsive post-hearing brief, it did not do so.

disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Flores-Ortega,* 528 U.S. at 477 (cited cases omitted); *see also Garza v. Idaho*, — U.S. —, 139 S. Ct. 738, 746 (2019) ("Where . . . a defendant has expressly requested an appeal, counsel performs deficiently by disregarding the defendant's instructions."). Under such circumstances, "prejudice is presumed 'when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken,'" and "'no further showing from the defendant of the merits of his underlying claims'" is required. *Garza,* 139 S. Ct. at 744, 747 (quoting *Flores-Ortega,* 528 U.S. at 484); *United States v. Tapp*, 491 F.3d 263, 265-66 (5th Cir. 2007) (finding the defendant need only show "a reasonable probability that, but for counsel's failure, he would have timely appealed"). This "presumption applies even when the defendant has signed an appeal waiver." *Garza*, 139 S. Ct. at 744-45; *see also Tapp,* 491 F.3d at 266 (extending the *Flores-Ortega* rule to cases where a defendant has waived his right to direct appeal and collateral review).

Even where a defendant does not instruct counsel to file an appeal or clearly convey his desire to appeal, however, counsel has a constitutional duty to consult with the defendant about an appeal. *Flores-Ortega,* 528 U.S. at 480. Such a duty arises "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* In this context, consulting means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.* at 478; *United States v. Pham,* 722 F.3d 320, 323-24 (5th Cir. 2013).

### B. Evidentiary Hearing Testimony

Trial counsel Vincent Carrizales ("Carrizales") testified that before the sentencing hearing, he and Vargas discussed and signed the Notice of Right to Appeal. Doc. 30 at 9. He also recalled lengthy discussions with Vargas about his appellate rights before he pled guilty. Doc. 30 at 22. Carrizales testified that following sentencing, he had only a brief exchange with Vargas in the courtroom and told him that he would stop by the United States Marshal Service's holding facility ("Marshal's lockup") shortly to discuss in details of all that had transpired at sentencing. Doc. 30 at 6, 9-10. He testified that did not recall Vargas telling him to do anything. Doc. 30 at 10, 23. Carrizales then visited with Vargas' family members in the hallway outside the courtroom. Doc. 30 at 10, 23.

Carrizales testified that he subsequently met Vargas for about 25-30 minutes in Marshal's lockup. Doc. 30 at 12. Carrizales stated that they both were disappointed with the sentence, especially the Court's decision to overrule the objections to the increases in the offense level. Doc. 30 at 11. Carrizales discussed the objections with Vargas and told him that the Judge had followed the law, made a fact-based decision, and explained her reasons and that, consequently, there was no appealable issue. Doc. 30 at 12, 13-14. According to Carrizales, Vargas agreed with his assessment and understood his explanations. Doc. 30 at 23. Carrizales further testified that toward the end of the visit, he advised Vargas he had "no intention of appealing," and Vargas responded, "I understand that. We're not going to appeal." Doc. 30 at 12. Carrizales also recalled counseling Vargas, "this is your call. If you tell me to file an appeal, I'll file one." Doc. 30 at 13. According to Carrizales, however, Vargas never asked him to file an appeal. Doc. 30 at 13.

Carrizales testified that following the sentencing hearing, Vargas' girlfriend, Kelly Van Heule ("Van Heule"), and several family members contacted Carrizales via text messages to discuss primarily Vargas' medical condition (due to a diabetic episode and subsequent hospitalization) and to determine where he was being housed. Doc. 30 at 14-16. Vargas also sent Carrizales text messages while he was housed at FCI Seagoville. Doc. 30 at 14-15. During the 14-day period to file a notice of appeal, Van Heule also inquired via text whether a notice of appeal was "in the works," to which Carrizales responded that no notice of appeal had been filed and there was no legal reason to appeal. Doc. 30 at 19. Carrizales testified that there were follow-up text messages with Van Heule on February 10—within the 14-day period to appeal—in which she inquired whether he was "still representing" Vargas. Doc. 30 at 25-26; *see also* Gov's Exh. 1. Carrizales stated he again advised Van Heule that no notice of appeal had been filed and repeated his reasons why he did not believe an appeal would be helpful. Doc. 30 at 25-26. Van Heule in turn responded, "[w]e are not looking for appeals at this time" but were concerned about Vargas' medical condition and the insufficient dosage of insulin he was receiving. Doc. 30 at 25-26; Gov's Exh. 1.

Carrizales acknowledged that he did not send Vargas any correspondence regarding his ability to appeal or why he should not appeal. Doc. 30 at 19. But he recalled visiting Vargas at FCI Seagoville and again advising him that he did not think an appeal made sense. Doc. 30 at 20, 26-27. Carrizales testified that he believed the visit occurred within the 14-day window to timely file a notice of appeal but was unsure about the exact date. Doc. 30 at 20, 29. Carrizales testified that if Van Heule's February 10th message had indicated that Vargas wanted to appeal, he would have made sure to visit him by February 14th deadline for filing the notice. Doc. 30 at 30.

Van Heule testified that Carrizales met with her and Vargas' family members after the sentencing hearing in the hallway outside the courtroom to inform them of the "next steps"—including where Vargas would be taken since he had not previously been in custody. Doc. 30 at 33. Van Heule stated she had the impression that Carrizales would file a notice of appeal. Doc. 30 at 45. She further testified that she also remembered hearing Vargas tell Carrizales immediately after the sentencing to file a notice of appeal, as she indicated in her prior sworn statement. Doc. 30 at 44-45.

Van Heule testified that she visited Vargas at the Kaufman County Jail two or three times before he was transferred to FCI Seagoville. At one of the visits, she learned "it was important to take care of [the] appeal within a certain time frame," so she contacted Carrizales via text messages a few times to check on the status of an appeal. Doc. 30 at 35-36. Van Heule admitted that she did not know the exact date of her February 2020 texts with Carrizales but believed they had been during the 14-day window to timely file a notice of appeal. Doc. 30 at 37, 41. In response to the Court's inquiry, Van Heule said she took screen shots of the texts with Carrizales and sent them to Vargas' mother. Doc. 30 at 46. She claimed, however, that her phone did not display the date of the texts and that the displayed dates of the texts were automatically deleted from the screen shots she took. Doc. 30 at 47.

Vargas testified that he understood that he could appeal his sentence within 14 days of sentencing despite his waiver of appeal. Doc. 30 at 53, 54. Vargas recalled being very upset and emotional after the sentence was pronounced. Doc. 30 at 55-56. He remembered Carrizales telling him, "I can file the appeal. There's no problem for me if that will make you feel better." *Id.* Vargas testified he responded, "Yes, please. That's something that I very much would like." *Id.* Vargas also recalled speaking with Carrizales in U.S. Marshal's lockup for five-to-ten

minutes following sentencing. Doc. 30 at 58. Vargas testified that he was emotional, on the verge of tears, and that he told Carrizales, "we need to do something about this." Doc. 30 at 59. He also recalled discussing the sentence and the Presentence Report ("PSR") objections with Carrizales, and that, in the end, he "was of the impression that [Carrizales] was going to" file an appeal. Doc. 30 at 59-60. Vargas further testified that Carrizales assured him that he (Carrizales) could file the appeal. Doc. 30 at 60. On cross examination, however, Vargas conceded that that he did not instruct counsel to file an appeal, rather he remembered that "[t]he instructions were from [Carrizales] to me. If wasn't from me to him." Doc. 66.

After sentencing, Vargas stated he was detained at the Kaufman County Jail for ten days and then FCI Seagoville for seven or eight days, after which he was hospitalized due to a diabetic episode. Doc. 30 at 61-62. Vargas testified that, throughout the 14-day appeal window, his mother, brother, and girlfriend tried unsuccessfully to reach Carrizales. Doc. 30 at 63-65. Vargas also recalled that Carrizales visited him at FCI Seagoville between February 16-18, right after the 14-day deadline had passed. Doc. 30 at 67. According to Vargas, he did not ask Carrizales to file an appeal because the deadline to do so had already passed. Doc. 30 at 67.

In response to the Court's questions about whether he had ever told Carrizales "I want to file an appeal," Vargas recounted the brief exchange in the courtroom right after the sentencing when Carrizales said "we can file an appeal," and Vargas responded, "yes, I very much would like that, please." Doc. 30 at 68. Regarding the conversation in the Marshal's lockup, Vargas testified that he told Carrizales, "I wanted to get the appeal done, because I don't feel comfortable with 120 months." Doc. 30 at 68

### C. Failure-to-File Claim Lacks Merit

Vargas asserts Carrizales rendered ineffective assistance when he failed to file a notice of appeal as instructed by him and his family. Doc. 4 at 18; Doc. 8 at 11. He avers he and his family requested an appeal when the Court sentenced him to 120 months imprisonment, rather than the 60-month sentence he expected. Doc. 4 at 18. Vargas also argues that he "profoundly wanted to appeal" his guilty plea and the breach of plea agreement. Doc. 4 at 20.

In instances of conflicting witness testimony, the Court, as trier of fact, must make credibility determinations. Here, the Court finds Carrizales' testimony credible, specifically his testimony that Vargas never explicitly asked him to file an appeal. Carrizales was adamant that Vargas never asked him to appeal. On the other hand, Vargas waffled in his testimony on that subject. On cross examination, Vargas conceded he did not ask counsel to appeal, stating that rather, "[t]he instructions [to appeal] were from him to me. It wasn't from me to him." Doc. 30 at 66. However, during the Court's follow-up inquiry, the following exchange occurred:

> THE COURT: Did you ever say to Mr. Carrizales, "I want you to file an appeal"?
>
> THE WITNESS: Yes.
>
> THE COURT: When did you say that?
>
> THE WITNESS: When -- when we were at the sentencing after -- after I got sentenced -- like right after I got sentenced, I was -- I was very emotional. I was crying and he looked at me and was like, "It's okay. We can do the appeal."
>
> THE COURT: No, I didn't ask you if he said it. I said did you say it. What did you say and when did you say it?
>
> THE WITNESS: He said to me, "It's okay. We can file the appeal." And I

said, "Yes, I very much would like that, please."

    THE COURT: Now, you talked to him after that in the courthouse, correct? You talked to Mr. Carrizales after you walked away from the Court where you had been sentenced in the courthouse in the marshals' --

    THE WITNESS: Yes.

    THE COURT: Okay. You discussed the appeal at that time?

    THE WITNESS: Yes.

    THE COURT: What did you say to him? What did you say to him about appealing?

    THE WITNESS: That I wanted to get the appeal done, because I didn't feel comfortable with 120 months.

    THE COURT: So you said to Vincent Carrizales, "I want you to appeal. I don't feel comfortable with 120 months."

    THE WITNESS: Yes.

Doc. 30 at 68-69. The Court finds incredulous Vargas' sudden recall, after repeatedly stating that it was Carrizales not he who mentioned appealing, that he [Vargas] explicitly told Carrizales that he wanted to appeal.

Further, Vargas' testimony that he "was of the impression that [Carrizales] was going to" file an appeal, Doc. 30 at 59-60, and that he "wanted to get the appeal done, because [he] didn't feel comfortable with 120 months," Doc. 30 at 68-69, does not establish he explicitly instructed Carrizales to appeal. Moreover, the scant documentary evidence introduced—the partial screenshots of text messages between Carrizales and Van Heule—support Carrizales' version of the events. It is telling that in response to Van Heule's inquiry whether Carrizales was still

9

Vargas' lawyer, Carrizales' texted that he would not be filing an appeal, after which Van Heule replied, "[w]e are not looking for appeals at this time," and went on to express concern about Vargas' medical condition and location.

In his post-hearing brief, Vargas cites *United States v. Pham*, 722 F.3d 320, 323-24 (5th Cir. 2013), in support of his contentions. Like the movant in *Pham*, Vargas argues he was visibly upset about his sentence and told counsel he wanted to do something. Doc. 31 at 7. *Pham*, however, involved defense counsel's complete failure to consult with the defendant regarding an appeal, *Pham*, 722 F.3d at 323-24, rather than counsel's failure to file a notice of appeal, as originally alleged in this case. Indeed, after the sentence was imposed, Pham's counsel "neither mentioned the possibility of an appeal at all nor made any effort to discover Pham's wishes in that regard." *Id.* at 324. That is not the case here, as confirmed by the testimony at the evidentiary hearing. Therefore, *Pham* is inapposite.[2]

On this evidence, the Court finds that Vargas did not explicitly state that he wanted to appeal. *See Flores-Ortega*, 528 U.S. at 477 ("[A] defendant who explicitly tells his attorney *not* to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently." (emphasis in original)). Moreover, because Carrizales did not disregard an explicit instruction from Vargas to file a notice of appeal, he was not constitutionally ineffective. *See Flores-Ortega*, 528 U.S. at 477 (restating that "a lawyer who disregards specific

---

[2] Because Vargas raised only a failure-to-file claim, Doc. 4 at 18-20; Doc. 8 at 11, a new post-hearing failure-to-consult claim would not relate back to it as it is based on facts different from those underlying his failure-to-file claim. *See United States v. Alaniz*, 5 F.4th 632, 637 (5th Cir. 2021) (holding new, post-hearing, failure-to-advise and failure-to-consult claims did not relate back to timely failure-to-file claim because they did "not arise out of the same set of fact as [the] earlier failure-to-file claim"); Fed. R. Civ. P. 15(c)(1)(B); *see also Mayle v. Felix*, 545 U.S. 644, 664 (2005) (concluding that only claims "tied to a common core of operative facts" as the claims in the original petition will relate back).

10

instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable" (cited cases omitted)).   In sum, Vargas is not entitled to relief on his claim that counsel failed to file a requested notice of appeal.

### III. REMAINING CLAIMS

#### A. Applicable Standard

To be constitutionally valid, a guilty plea must be knowingly, voluntarily, and intelligently made.  *United States v. Hernandez*, 234 F.3d 252, 254 (5th Cir. 2000).  In determining the voluntariness of a plea, the court considers all relevant circumstances, including whether the defendant: (1) had notice of the charges against him; (2) understood the constitutional protections he was waiving; and (3) had access to competent counsel.  *United States v. Shepherd*, 880 F.3d 734, 740-41 (5th Cir. 2018); *see also Boykin v. Alabama,* 395 U.S. 238, 244 (1969) (to be knowing and intelligent, the defendant must have "a full understanding of what the plea connotes and of its consequence").

In addition, when challenging the validity of his guilty plea, a movant ordinarily may not refute his sworn testimony given at a plea hearing while under oath.  *United States v. Cervantes,* 132 F.3d 1106, 1110 (5th Cir. 1998).  The movant must also overcome the presumption of regularity and "great evidentiary weight" accorded court records.  *See United States v. Abreo*, 30 F.3d 29, 32 (5th Cir. 1994) (holding signed, unambiguous plea agreement "is accorded great evidentiary weight" when determining whether plea is entered voluntarily and knowingly).

Further, as previously noted herein, to succeed on a claim of ineffective assistance of counsel, the movant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Failure to establish either deficient performance or prejudice defeats the claim.  *Id.* at

697. To prove the deficient performance prong, movant must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. The proper measure of attorney performance is reasonableness under prevailing professional norms. *Id.* at 688.

To establish prejudice, movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of a guilty plea, that means the movant must show that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The movant bears the burden of showing that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* In the sentencing context, however, the movant must demonstrate that his sentence was increased by the deficient performance of defense counsel. *Glover v. United States*, 531 U.S. 198, 200, 203-04 (2001).

### B. Vargas' Guilty Plea was Voluntary

Obviously dissatisfied with his sentence, Vargas asserts his guilty plea was not knowing and voluntary, and that the government and defense counsel "allowed the breach of the plea agreement." Doc. 4 at 5, 6-9. Specifically, Vargas alleges that the superseding information did "not give [him] notice of the minimum and maximum penalty," and that he first learned of the minimum sentence of 5 years in the plea agreement. Doc. 4 at 7. He also contends that he should have been sentenced "to the mandatory minimum of 5 years" under 21 U.S.C. § 841(b)(1)(B)(viii), and not "the mandatory minimum of 10 years" under 21 U.S.C. § 841(b)(1)(A)(viii). Doc. 4 at 8-9. According to Vargas, his ten-year sentence was contrary to

counsel's advice based on "the plea agreement [that] his sentence would be in the 57-71 months maximum range."  Doc. 4 at 9.

In his reply, Vargas further argues that his "reasonable understanding when entering the plea was a maximum sentence exposure of sixty months (5 years), and that he was pleading guilty to 50 grams of controlled substance."  Doc. 14 at 3.  He also maintains that the purported "breach took the plea from 50 grams or more to 500 grams or more under § 841(b)(1(A)," despite the "promise of less than 60 months."  Doc. 14 at 3-4.

A federal grand jury charged Vargas and his coconspirators by indictment with conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(viii).  Crim. Doc. 1.  Vargas, however, subsequently waived his right to indictment and pled guilty to a superseding information that charged him with conspiracy to possess with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B)(viii), thereby capping his sentencing exposure at 40 years rather than life.  Crim. Doc. 207; Crim. Doc. 208; Crim. Doc. 209; Crim. Doc. 210; Crim. Doc. 211.  Contrary to Vargas' assertions, however, the superseding information, plea agreement, factual resume, and PSR all cite the correct penalty provision as § 841(b)(1)(B)(viii), which corresponds to an imprisonment range of five-to-40 years' imprisonment.  Crim. Doc. 209 at 2; Crim. Doc. 210 at 1; Crim. Doc. 286-1 at 12.  Throughout his pleadings, Vargas also complains of a typographical error in the superseding information charging him with "50 grams *of* more of a mixture or substance," rather than "50 grams *or* more of a mixture of substance," as the plea agreement, factual resume, and PSR correctly state.  Crim. Doc. 207 at 1 (emphasis added).  This error was clearly a mere clerical one.  See *United States v. Sprick*, 233 F.3d 845, 854 (5th Cir.

2000) ("Clerical or drafting errors [in indictment] . . . , which should cause no confusion, do not prejudice the defendant." (citations omitted)); *United States v. Steen*, 55 F.3d 1022, 1025–27 (5th Cir. 1995) ("'Practical rather than technical considerations govern resolution of [indictment] challenges and we will not reverse for minor deficiencies which do not prejudice the accused.'" (quoting *United States v. Chappell,* 6 F.3d 1095, 1099 (5th Cir. 1993) ("An indictment need only charge the essential elements of the offense, permitting the accused to prepare a defense . . . "))).[3]

More importantly, Vargas' sworn statements at rearraignment contradict his current assertions that his plea was induced by misinformation regarding his potential sentence. At rearraignment, the Court thoroughly cautioned Vargas that only the Court would determine the sentence after considering the PSR and any objections. Crim. Doc. 420 at 9-10. Vargas was also admonished that the Court could consider facts not stipulated to in the factual resume in determining the sentence and, if that happened, Vargas would not be permitted to withdraw his guilty plea. Crim. Doc. 420 at 10.

Vargas confirmed under oath his understanding that by pleading guilty he would be subject to minimum and maximum imprisonment of five and 40 years, respectively. Crim. Doc. 420 at 19. By his *Plea Agreement*—which he likewise confirmed under oath that he signed only after reading it carefully and discussing it with his counsel—Vargas also confirmed his understanding that (1) by pleading guilty, he would be subjected to "imprisonment for a period of not less than 5 years, and not to exceed 40 years," (2) the Court would determine the sentence

---

[3] That notwithstanding, any defect in the superseding information is waived since Vargas entered a knowing and voluntary plea as explained below. It is well established that a valid plea waives any challenge to nonjurisdictional defects. *See* United States v. Daughenbaugh, 549 F.3d 1010, 1012 (5th Cir. 2008). "[D]efects in an indictment do not deprive a court of its power to adjudicate a case." United States v. Cotton, 535 U.S. 625, 630 (2002); United States v. Cothran, 302 F.3d 279, 283 (5th Cir. 2002) ("*Cotton* demonstrates that standard waiver principles apply to defects in the indictment.").

after considering the advisory Sentencing Guidelines, (3) no one, including defense counsel, could "predict with certainty the outcome of the Court's consideration of the guidelines," and (4) the Court, in its discretion, could sentence Vargas up to the statutory maximum penalty. Crim. Doc. 420 at 15; Crim. Doc. 210 at 1-2, 3-4. Vargas also confirmed that his guilty plea was not induced by promises or assurances of any kind, Crim. doc. 420 at 15, 18, and he was fully satisfied with his counsel's advice and representation, Crim. Doc. 420 at 11.

Finally, Vargas had ample time—more than eight months between rearraignment and his sentencing hearing—to advise the Court that his guilty plea was involuntary or that he was dissatisfied with defense counsel's conduct and purportedly misleading statements about his guideline range, but he did not do so. Similarly at sentencing, Vargas voiced no objection about the voluntariness of his guilty plea or his counsel's advice and allegedly deficient performance. Indeed, when given the opportunity to address the court *after* the court overruled counsel's objections to the manager-supervisor enhancement and confirmed his ineligibility for the safety valve, Vargas apologized for his actions, admitted his guilt, and largely minimized his role in the offense by claiming he was in fear of coconspirators. Crim. Doc. 419 at 67-70. Vargas also thanked counsel for representing him. Crim. Doc. 419 at 71. But again, he did not suggest that his guilty plea was the result of misinformation or erroneous advice by counsel. These circumstances strongly suggest Vargas' claims are driven by "buyer's remorse" rather than any defect in the guilty plea procedure.

Vargas offers no reliable evidence to rebut the record and the Court's findings that his guilty plea was knowing and voluntary. His belated, self-serving assertions, all belied by the record, are insufficient to contradict Vargas' sworn testimony at rearraignment. *See Lee v. United States*, ___ U.S. ___, 137 S. Ct. 1958, 1967 (2017) ("Courts should not upset a plea

solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."); *United States v. Crain*, 877 F.3d 637, 650 (5th Cir. 2017) (explaining that "self-serving post hoc assertions about how [the defendant] would have pled" do not negate contemporaneous comments at the plea hearing).

That notwithstanding, Vargas has wholly failed to demonstrate prejudice—namely that but for his counsel's allegedly erroneous advice, he would not have pleaded guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 59. Vargas does not allege, much less offer any proof, that he ever considered doing anything other than entering a knowing and voluntary plea. In the light of his solemn assurances under oath of his understanding of the guilty plea process and consequences of his plea, versus the hindsight of an undesired sentence, Vargas falls far short of meeting his burden to prove that he was prejudiced by counsel's allegedly deficient performance.[4]

For the foregoing reasons, the Court concludes that Vargas has failed to establish that his guilty plea was not knowing and voluntary because of counsel's allegedly deficient performance or that he was prejudiced as a result of the same. Thus, Vargas's ineffective assistance claims in relation to his guilty plea fail.

### C. Ineffective Assistance Claims at Sentencing Lack Merit

Vargas also asserts trial counsel rendered ineffective assistance at sentencing. He avers counsel failed to (1) adequately challenge the offense-level increases for abusing a position of

---

[4] Contrary to Vargas' assertions, the government filed the supplemental plea agreement and motion for downward departure (the latter referred in his pleadings as supplemental memorandum). Doc. 4 at 7-8, 24. Doc. 4 at 8-9; Doc. 14 at 3-4, 6. Because these pleadings were filed under seal, they do not appear on the public docket sheet.

trust and for being a manager or supervisor, (2) request that he receive a safety-valve adjustment, (3) investigate and prepare for the sentencing hearing, and (4) counter the government's argument that there was no sentencing disparity. Doc. 4 at 9-18, 21-23; Doc. 8 at 2-7.

Vargas claims are unavailing. First, the Court sustained defense counsel's objection to the abuse-of-trust increase under USSG § 3B1.3. Crim. Doc. 419 at 9. Second, counsel extensively cross examined the special agent and ably argued his objection to the manager-supervisor increase under USSG § 3B1.1(b). Crim. Doc. 419 at 12-59. That trial counsel was unsuccessful in his efforts does not equate to ineffective assistance. *See Youngblood v. Maggio, 696 F.2d 407, 410 (5th Cir. 1983)* (per curiam) (holding unsuccessful efforts do not constitute ineffective assistance of counsel). Relying on the agent's testimony, the PSR, and the evidence submitted under seal, the Court nevertheless found the evidence strongly supported that Vargas was a manager/supervisor and not just a low-level player. Crim. Doc. 419 at 55-57. As the Court meticulously explained, the evidence revealed that Vargas had exercised decision-making authority, recruited two accomplices, and trained at least one coconspirator. *Id.* And as the Court explained, Vargas' was ineligible for the safety-valve adjustment because of his manger-supervisor role. Crim. Doc. 419 at 10, 58-59.

On this record, there also is no evidence that the Court would have ruled differently. Indeed, the Court specifically stated that it "would have imposed the same sentence for the same reasons given during this sentencing hearing regardless of the applicable guideline range." Crim. Doc. 419 at 83. Thus, contrary to Vargas' arguments, calling codefendants to testify about his alleged minimal role in the conspiracy—specifically, his alleged role as a mule, duties as a baggage handler, and sole involvement of loading a package on a plane—would not have changed the outcome. Doc. 4 at 12-18; Doc. 14 at 4.

17

Likewise, Vargas' belated contention that counsel failed to "prepare, investigate, and place the government's [sic] through adversarial challenges" at sentencing fails on the merits as detailed *supra*. Doc. 8 at 3. Vargas essentially reiterates his previously rejected argument that his role in the conspiracy was minimal and he was nothing more than "a scared and threaten[ed] mule." Doc. 8 at 6; Doc. 8 at 3-11. Further, his claim that counsel was not prepared at sentencing to argue that there was a disparity has no merit. Doc. 8 at 3, 7-10. The Court directed its questions about a possible sentence disparity to the Government, not defense counsel. Crim. Doc. 419 at 77-80.

In sum, Vargas cannot show that trial counsel's performance at sentencing was deficient. He also fails to indicate how he was prejudiced—that is, how counsel's actions resulted in an increase in his sentence. *See Glover*, 531 U.S. at 200, 203-04. Therefore, Vargas' ineffective assistance claims have no merit.

### D. Breach of Plea Agreement and Double Jeopardy Claims are Barred and Meritless

In his last two grounds for relief, Vargas reasserts his claim of breach of the plea agreement, alleging that the PSR unlawfully enhanced his sentence under § 841(b)(1)(A) to a mandatory 10-year minimum. Doc. 4 at 24. Relatedly, he complains of a double jeopardy violation because " the government dismissed the indictment" but "then used all its elements to enhance [his] penalty[.]" Doc. 4 at 26.

For the reasons previously stated, Vargas' claims are plainly refuted by the record. Further, the double jeopardy claim is waived because it does not fall within the appeal/collateral waiver in his plea agreement. Crim. Doc. 210 at 6; *see United States v. Cantrell*, 493 F. App'x 613, 614 (5th Cir. 2012) ("constitutional challenge to . . . sentence on grounds of double jeopardy is not a claim involving arithmetical error and is therefore barred by the waiver").

18

Additionally, having failed to raise these issues on direct appeal, they are also procedurally defaulted absent a showing of both (1) cause excusing his procedural default and (2) actual prejudice resulting from the error. *United States v. Logan*, 135 F.3d 353, 355 (5th Cir. 1998) (citing *United States v. Frady*, 456 U.S. 152, 168 (1982)). An exception to the cause and prejudice requirement is reserved for the "'extraordinary case . . . in which a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). That's not the case here, as Vargas does not allege anything that would meet either the cause and prejudice or the actual innocence requirements.

### E. Evidentiary Hearing Request

In his reply, Vargas contends that he is entitled to an evidentiary hearing on his remaining claims. Doc. 14 at 4, 9-10. However, "[w]hen the files and records of a case make manifest the lack of merit of a Section 2255 [motion], the trial court is not required to hold an evidentiary hearing." *United States v. Hughes*, 635 F.2d 449, 451 (5th Cir. 1981); *see also United States v. Reed*, 719 F.3d 369, 373-74 (5th Cir. 2013) ("A defendant is entitled to an evidentiary hearing on his § 2255 motion only if he presents 'independent indicia of the likely merit of [his] allegations.'" (quoting *United States v. Cavitt*, 550 F.3d 430, 442 (5th Cir. 2008))). Because Vargas' remaining claims lack merit for reasons wholly supported by the record, as previously noted, no evidentiary hearing is required. *See United States v. McClinton*, 782 F. App'x 312, 314-15 (5th Cir. 2019) (per curiam) (no evidentiary hearing needed when "contemporaneous evidence" at rearraignment conclusively negated movant's *post hoc* assertions).

## IV. CONCLUSION

For the foregoing reasons, Vargas' § 2255 motion should be **DENIED**, and this case should be **DISMISSED WITH PREJUDICE**.

**SO RECOMMENDED** on April 29, 2022.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, the basis for the objection, and the place in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds,* 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).